**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **Case No.: 1:23-CR-000035-RC** |
| **PATRICK BOURNES** | |
| **Defendant.** | |

**UNOPPOSED MOTION TO EXTEND DEADLINE**
**AND FOR LEAVE TO FILE SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully moves this Court to extend the deadline to file sentencing memoranda and for leave to file its memorandum, attached to the instant motion.   In support of its motion, the government relies on the following:

- On February 9, 2024, defendant Patrick Bournes pled guilty to Count One of the Superseding Indictment pursuant to a plea agreement.   ECF No. 141, 142; Minute Entry dated February 9, 2024.

- The Court scheduled a sentencing hearing for June 28, 2024, with a corresponding deadline of June 7, 2024 for the parties to file their sentencing memoranda, and reply deadline of June 14, 2024.

- The jury trial for Bournes' co-defendants Micaiah Joseph and Casey Tryon-Castro, took place from May 28-June 10, 2024.   Due to that trial, government counsel previously filed an unopposed motion to extend time for the parties to file their sentencing memoranda in this case (ECF No. 181), which was granted by the Court, Minute Order dated 5/23/2024.

- In addition to *United States v. Tryon-Castro et al*., government counsel had a subsequent

trial before Judge Mehta, which began on June 12 and finished on June 14 (*United States v. Michael Daniele*, 23-cr-143).

- Government counsel was sick at the end of that week, and inadvertently missed the June 14 filing deadline for the sentencing memoranda.

- Government counsel now seeks leave to file the government's sentencing memorandum, which is attached to the instant motion.   The government has consulted with defense counsel, and he does not oppose the instant motion.

For the foregoing reasons, the government respectfully requests that the Court grant its unopposed motion to extend the deadline and for leave to file its sentencing memorandum, and for any other relief this Court deems just and proper.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      /s/ *Sarah C. Martin*
Sarah C. Martin
Assistant United States Attorney
D.C. Bar 1612989
601 D Street NW
Washington, DC
(202) 252-7048
Sarah.Martin@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-35-RC** |
| **PATRICK BOURNES,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Patrick Bournes to eleven months of incarceration, two years of supervised release, $2,000 in restitution, a fine, and the mandatory assessment of $100 for a felony conviction.   The government's recommendation represents the midpoint of the guidelines range, which is 8-14 months.

### I.     INTRODUCTION

The defendant, Patrick Bournes, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05.   That amount reflects, among other things, damage to the United

Bournes, a 60-year-old retired engineer from Santa Clara, California, traveled to Washington, D.C. and attended the "Stop the Steal" rally at the Ellipse before going to the Capitol. At the Capitol, Bournes made his way through the West front of the Capitol grounds, and ultimately to the Lower West Terrace tunnel ("the tunnel").   Bournes entered the tunnel at 3:03 p.m. and remained until 3:11 p.m.   While inside, Bournes and other rioters pushed in concert against the police line, and at one point, Bournes helped pass back a police shield to rioters behind him.   Bournes stood at the front of the rioters and shouted "TRAITORS!" several times at the police officers directly across from him.   He also positioned himself near a "shield wall" created by rioters to push against the police, and Bournes, along with another individual, used the shield to press rioters into the police line directly in front of them.

The government recommends that the Court sentence Bournes to eleven months of incarceration. An eleven-month sentence reflects the gravity of Bournes' conduct, but also acknowledges his early admission of guilt.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers the Court to the stipulated Statement of Offense filed in this case, ECF No. 142, for a short summary of the January 6, 2021 attack on the United States Capitol by

---

States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum.   However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

**B.**      **The Assault on the Lower West Terrace Tunnel**

The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line.  *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117  Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol in the area known as the Lower West Terrace ("LWT").   The entrance usually consists of a flight of stairs leading to a doorway.   On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long.   That tunnel led to two sets of metal swinging doors inset with glass. On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building.   The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building.   This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries.   How the Lower West Tunnel usually

appears on Inauguration Day is shown in Figure 1.[2]



*Figure 1.*

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.   Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department ("MPD"), were arrayed inside the doorway and guarding the entrance.   Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 PM, the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at

---

[2] Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.

the rioters, who continued to resist.   The mob continued to grow, and the rioters pushed their way

into the second set of doors, physically engaging law enforcement with batons, poles, chemical

spray, bottles and other items.   Officers created a line in the doorway to block the rioters and

physically engaged them with batons and OC spray.   At a later hearing on the events of January

6, Congressman Stephanie Murphy described her experience nearby this location in response to

testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors

between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer
> of power, and it was an attack on this Capitol building, but it was also an attack on
> real people.   And most people don't know this -- and I don't think even you know
> this -- but your actions had a profound impact on me.   So, at 3:00 p.m. on January
> 6th, 2021, while you were holding back the mob at the Lower West Terrace
> entrance, I was holed up with Congresswoman Kathleen Rice in a small office
> about 40 paces from the tunnel that you all were in.   That's about from the distance
> where I'm sitting here on the dais to that back wall.   And from that office in close
> proximity to where you all held the line, I listened to you struggle.   I listened to
> you yelling out to one another.   I listened to you care for one another, directing
> people back to the makeshift eyewash station that was at the end of our hall.   And
> then, I listened to people coughing, having difficulty breathing, but I watched you
> and heard you all get back into the fight."   Testimony of USCP Sgt. Gonell, MPD
> Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before
> the House Select Comm. to Investigate the January 6th Attack on the United States
> Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available
> at   https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-
> attack.

The violent and physical battle for control over the LWT entrance in the tunnel and

doorway area continued for over two hours, during which time rioters repeatedly assaulted,

threatened, pushed, and beat law enforcement officers.   The battle for the LWT entrance involved

intense hand-to-hand combat, and some of the most violent acts against law enforcement, including

the abduction and tasering of MPD Officer Michael Fanone and the previously-mentioned assault

of Officer Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force.   Capitol Police Sgt. Aquilino Gonell, who was present in the tunnel that day, explained:

> What we were subjected to that day was like something from a medieval battle. We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process. My fellow officers and I were committed to not letting any rioters breach the Capitol. It was a prolonged and desperate struggle.   *Id.* (Statement of Sgt. Aquilino Gonell)

Despite the mob's efforts, the officers in the LWT held the line with commendable restraint, and through personal sacrifice and valor. Officer Fanone remembers one of his colleagues' actions that day:

> In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle remained cool, calm, and collected as he gave commands to his officers. "Hold the line," he shouted over the roar. Of course, that day, the line was the seat of our American government. Despite the confusion and stress of the situation, observing Ramey's leadership, protecting a place I cared so much about, was the most inspirational moment of my life. The bravery he and others showed that day are the best examples of duty, honor, and service.   *Id.* (Statement of Officer Michael Fanone)

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line around 5 p.m.

6

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the tunnel area.   It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including potential harm to members of Congress.

### C.    Bournes' Role in the January 6, 2021 Attack on the Capitol

#### *Approach to the Capitol*

After leaving the "Stop the Steal" rally, Bournes approached the Capitol from the west. As he was making his approach, Bournes would have heard the sounds of the riot already raging on the West Front and would have been aware of the measures that police were using to protect the building, including sirens, detonation of concussive devices, pepper spray, and loudspeakers ordering the crowd to disperse.

As Bournes made his final approach to the West Front of the Capitol, a series of events happened there in rapid succession.   At 2:08 p.m., the mob breached the Northwest Stairs, giving them access to the Northwest Courtyard and the path to the Senate Wing Door, which was itself breached five minutes later at 2:13 p.m.   At 2:28 p.m., rioters overwhelmed the police line in the West Plaza.   Between 2:28 p.m. and 2:41 p.m., the officers on the West Front retreated up the West Stairs to the Lower West Terrace and ultimately into the Lower West Tunnel.   At the same time, the mob also continued up the West Front in pursuit of the retreating officers with some rioters assaulting the officers as they retreated.

Inside of the LWT tunnel, officers secured a set of glass doors to prevent entry into the

tunnel by the rioters.   At 2:42 p.m., rioters began to break through the locked glass doors that the officers had secured.   From behind a second set of swinging doors, the officers watched as the glass separating them from the rioters shattered and the rioters were able to advance further into the tunnel.   From there, one of the most violent and prolonged confrontations between rioters and police on January 6 occurred.   Twenty-one minutes after the first rioters smashed the glass doors in the tunnel, Bournes joined the fray on the Lower West Terrace.

### Bournes' Entry into the Lower West Terrace Tunnel

At approximately 2:53 p.m., Bournes had made his way up the West front.



*Figure 2*

At 3:03 p.m., Bournes entered the LWT tunnel.



*Figure 3*

Quickly upon entering the tunnel, Bournes rushed forward and engaged in a push with other rioters against the police line.   Gov. Ex. 1.



*Figure 4*

Bournes continued to push his way deeper into the tunnel, and closer to the police line, despite police raising their shields and deploying OC spray at the rioters.   Rioters began pulling shields away from the officers on the front line, including Bournes' co-defendant Casey Tryon-Castro, and passing them back to rioters in the tunnel.   Bournes helped in that effort.



*Figure 5*



*Figure 6*

After handing back the shield, Bournes watched as the police tried to fight back, and in response,

Bournes pushed forward to the front of the rioters.   As one rioter cycled out from the front,

Bournes patted him on the back and continued forward.   Gov. Ex. 2.   When he got to the front

of the line, Bournes repeatedly yelled at the police, including screaming "TRAITORS".   *Id.*



*Figure 7*

Rioters began passing back up the shields they had taken from police, and yelled "Make a shield wall!", "Lock the shields together!", and—two minutes later—"Push!"   Gov. Ex. 3.1.   Amidst that effort, Bournes coordinated with another rioter, who had a shield, to get the other rioter in front of him, at which time they both held onto the shield and used the shield to push against the rioters in front of them, who were in turn pressing against the police line.   *Id.*



*Figure 8*



*Figure 9*

When the rioters pushed their collective weight against this shield wall, they pinned Officer

Daniel Hodges between the shield and the door frame, while the push continued as a rioter

screamed "LET US THROUGH!"[3]   Gov. Ex. 3.2.   Sometime after, Bournes moved toward the

entrance of the tunnel, where he exited at approximately 3:11 p.m.

---

[3] Officer Hodges later testified about this moment: "It hurt a great deal. It, combined with everything else that was going on, made it difficult to breathe. Being crushed by the shield and the people behind it made me defenseless, injured, made me—contributed to my diminishing senses after the assault, which is why I was calling for help, because I knew maintaining that position and staying upright was untenable. If I was there much longer being assaulted in such a way, I knew that it was very likely I wouldn't be able to maintain my consciousness and become a liability to the other officers." *United States v. McCaughey et al.*, 21-cr-40 (TNM), Trial Tr., 8/30/2022 at 204:12-21. The image of Officer Hodges being crushed in the doorway in the Lower West Terrace tunnel and calling out for help is one of the enduring images of the January 6 assault on the Capitol and is demonstrative of the very real and very serious physical danger that the police officers who defended the Capitol were in.



*Figure 10*

## III.    THE CHARGES AND PLEA AGREEMENT

On September 6, 2023, a federal grand jury returned a superseding indictment charging Bournes with five counts, including obstructing, impeding, or interfering with law enforcement during a civil disorder, in violation of 18 U.S.C. § 231(a)(3).   On February 9, 2023, Bournes was convicted of that offense based on a guilty plea entered pursuant to a plea agreement.   Minute Entry, February 9, 2023; ECF No. 141-42.

## IV.    STATUTORY PENALTIES

Bournes now faces sentencing on the one count of obstructing, impeding, or interfering with law enforcement during a civil disorder.   As noted by the plea agreement and the Presentence Report ("PSR") issued by the U.S. Probation Office, the defendant faces up to 5 years of

15

imprisonment, a term of supervised release of not more than three years, a fine up to $250,000,

restitution, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings

by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007).   That guidelines analysis, set forth in the plea agreement and PSR is as follows:

**Count One: 18 U.S.C. § 231(a)(3) – Civil Disorder**

| Base Offense Level | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Specific Offense Characteristic – Physical Contact | +3 | U.S.S.G. § 2A2.4(b)(1): "the offense involved physical contact." |
| Total | 13 | |

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline,

U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who

have no criminal history points and who meet certain additional criteria.   Section 4C1.1 will be in

effect at the time of sentencing in this matter, but was not considered at the time the parties entered

into the plea agreement.

Section 4C1.1 does not apply in this case because Bournes used violence and credible

threats during the commission of the offense.[4]   U.S.S.G. § 4C1.1(3).   Specifically, Bournes used

physical force while pushing against the police line and coordinating a "shield wall" to use against

---

[4]  The defense and probation appear to agree that the 4C1.1 adjustment does not apply here as both agree that Bournes' guidelines calculation is 11.   Defense Memo at 2 (ECF No. 229); Final PSR ¶ 59 (ECF No. 196).

16

the police.   *See United States v. Bauer*, No. 21-cr-386-2 (TNM) ECF No. 195 at 4-5 (defining violence as "[t]he use of physical force," typically "accompanied by fury, vehemence, or outrage" and "unlawfully exercised with the intent to harm"); *see also United States v. Hernandez*, No. 21-cr-445 (CKK), ECF No. 65 at 5 (adopting TNM's definition of violence from Bauer).   Bournes also stood opposite the police as they were facing down the rioters and yelled "TRAITORS!", which combined with his actions in the tunnel, was a credible threat.   *See Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 6 (defining a credible threat of force as "a believable expression of an intention to use physical force to inflict harm").   Bournes' actions should be viewed in context of what he witnessed in the tunnel—e.g., constant assaults on police officers, concerted pushes against the police line, use of OC spray by and against the police, and projectiles thrown at police.

The government is also aware that other judges have declined to apply the 4C1.1 adjustment in similar contexts.   For example, in *United States v. Arthur Reyher and Jessica Reyher*, Judge Walton did not apply the 4C1.1 reduction to either defendant, both of whom were convicted of the same charge here, and were in the LWT tunnel and engaged in coordinated pushes against the police.   *See United States v. Arthur Reyher and Jessica Reyher*, 23-cr-138 (RBW) (February 27, 2024) (explaining that "both [defendants] engaged in pushing to try and force entry into the United States Capitol, and I would have to conclude that when you associate yourself with people who are engaged in violence and you contribute to that violence, that you in fact are violent also").

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that, even if the Court

17

were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level.   Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[5]

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed.   PSR ¶ 62.   Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 11, Bournes' Guidelines imprisonment range is 8 to 14 months' imprisonment.   The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).   As described below, on balance, the Section 3553(a) factors weigh in favor of a term of incarceration.

---

[5] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

**A.      Nature and Circumstances of the Offense**

As shown in Section II(B) of this memorandum, Bournes' felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.   Bournes breached the restricted perimeter and entered the LWT tunnel, which was besieged by rioters for hours on January 6th.   While inside the tunnel, Bournes saw numerous officers being assaulted and pushed to the physical brink as they tried to keep the rioters from breaching the Capitol through the tunnel.   Bournes personally entered the tunnel and joined the rioters in their efforts to overwhelm the officers.

The nature and circumstances of Bournes' offense was of the utmost seriousness, and fully support the government's recommended sentence of eleven months of incarceration.

**B.  The History and Characteristics of the Defendant**

According to the PSR, Bournes is a retired engineer and has generally lived a successful professional life with family support.   Further, Bournes does not have any criminal history. Although January 6 appears to be out of Bournes' character based on the background in the PSR, it is nonetheless shocking that an individual who, by all accounts, is otherwise a productive member of society, would engage in such violence.   Thus, while Bournes' history and characteristics do not weigh in favor of a lengthy term of incarceration, a term of confinement is still appropriate given the extreme seriousness of his conduct.

19

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As mentioned above, this factor supports a sentence of incarceration.   Bournes' criminal conduct on January 6 was the epitome of disrespect for the law.   *See United States v. Cronin*, 22-cr-233 (ABJ), Tr. 6/9/2023 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").   Bournes, as one among many in this mob, attacked the seat of government and one of the foundational principles of our republic.   His crime was of the utmost seriousness and should in no way be minimized or distorted.   Moreover, Bournes presence in the tunnel—where some of the most violent assaults on police took place—adds to the seriousness of his participation in the riot.

**D.     The Need for the Sentence to Afford Adequate Deterrence**

***General Deterrence***

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B).   The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[6]   The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

---

[6] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

20

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this defendant also weighs heavily in favor of a term of incarceration.   Bournes is different from many other January 6 defendants because of his presence in the LWT tunnel and his decision to join the fray as he watched rioters assault police.   Bournes was not dissuaded by how crowded the tunnel was upon entry—he worked his way up to the front and helped other rioters obtain shields, which were ultimately used against the police.   He stood at the front line and yelled at officers as rioters continued to attack.   A term of incarceration would provide Bournes with specific deterrence to ensure he never engages in this type of criminal conduct again.

### E.   The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."   *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"   *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up).   Accordingly, courts must give "respectful consideration to the Guidelines."   *Id.* at 101.

21

### F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision

leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[7] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[8] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Roger Baugh*, 22-cr-313 (JEB), the defendant traveled to Washington for the "Stop the Steal" rally and after the rally, walked to the Capitol.   After entering the secure perimeter, Baugh went up to the LWT tunnel.   Baugh, like Bournes, saw what was happening in the tunnel and purposefully injected himself into the fray.   And, after witnessing the assaults on officers that were ongoing in the tunnel, Baugh, like Bournes, responded to the call of other rioters

---

[7] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

23

for help and joined in the coordinated push against officers.   Judge Boasberg sentenced Baugh to twelve months and one day of incarceration.

In *United States v. Arthur Reyher and Jessica Reyher*, 23-cr-138 (RBW), the Reyhers, like Bournes, went to the "Stop the Steal" rally and made their way onto restricted Capitol grounds, and ultimately into the LWT tunnel.   The Reyhers, like Bournes, joined rioters in a collective push against the police, and like Bournes, the Reyhers saw the officers repeatedly assaulted as they pushed.   The Reyhers, like Bournes, were a part of the push that crushed Officer Hodges between a door frame and a stolen police shield held by a rioter.   Judge Walton sentenced Arthur Reyher to eleven months of incarceration and Jessica Reyher to 90 days of incarceration—only reducing Jessica Reyher's sentence because of the couples' four minor children.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[9] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

---

[9] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Bournes must pay $2,000 in restitution, which reflects in part the role that Bournes played in the riot on January 6.[10]   Plea Agreement (ECF No. 141) at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023.   *Id.*   Bournes' restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 140.

## VIII.   FINE

Bournes' conviction for violating 18 U.S.C. § 231(a)(3) subjects him to a statutory maximum fine of $250,000.   18 U.S.C. § 3571(b).   In determining whether to impose a fine, the Court should consider the defendant's income, earning capacity, and financial resources.   *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d).   The sentencing guidelines provide for a fine in all cases except where the defendant establishes a current and future inability to pay. U.S.S.G. §

---

[10] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

5E1.2(a), (e) (2023).   The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay.   Thus, pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $4,000 to $40,000. U.S.S.G. § 5E1.2(c).

Under § 5E1.2(d), courts shall consider:

(1) The need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence;

(2) Any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources;

(3) The burden that the fine places on the defendant and his dependents relative to alternative punishments;

(4) Any restitution or reparation that the defendant has made or is obligated to make;

(5) Any collateral consequences of conviction including civil obligations arising from the defendant's conduct;

(6) Whether the defendant previously has been fined for a similar offense;

(7) The expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed; and

(8) Any other pertinent equitable considerations.

26

U.S.S.G. § 5E1.2(d). *See* 18 U.S.C. § 3572(a).

Pursuant to the PSR, Bournes was, until this arrest and his subsequent retirement, employed as an engineer.   PSR ¶ 87-96.   In that capacity, Bournes did well financially and has significant assets, and therefore an ability to pay a fine pursuant to the guidelines.   *Id.* ¶ 97.   The Court has the authority to use the corresponding monthly cost for imprisonment put forth by the PSR—$4,147.00—to impose an appropriate fine based on the number of months the Court ultimately imposes.[11]

## IX.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of eleven months of incarceration, two years of supervised release, $2,000 in restitution, a fine, and the mandatory assessment of $100 for a felony conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:   *Sarah C. Martin*
Sarah C. Martin
Assistant United States Attorney
D.C. Bar 1612989
601 D Street NW
Washington, DC
(202) 252-7048
Sarah.Martin@usdoj.gov

---

[11] If the Court imposes a term of probation, the Court similarly has the authority to use the monthly cost of probation put forth in the PSR, i.e., $366.00.